UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Producers Livestock Credit Corporation, *a Delaware corporation*,<br><br>    Plaintiff,<br><br>v.<br><br>Revier Brand Group, LLC, *a Minnesota limited liability company*; BRR Properties, LLC, *a North Dakota limited liability company*; MNR, LLC, *a Minnesota limited liability company*; and Olivia Farms, LLC, *a Minnesota limited liability company*,<br><br>    Defendants. | Civil No. 24-56 (DWF/JFD)<br><br>**MEMORANDUM OPINION AND ORDER** |

___

Benjamin J. Court, Esq., Kevin P. Kitchen, Esq., Stinson LLP; Phillip J. Ashfield, Esq., Spencer Fane LLP, counsel for Plaintiff.

Caren L. Stanley, Esq., and Drew J. Hushka, Esq., Vogel Law Firm, counsel for BRR Properties, LLC.

Erik A. Ahlgren, Esq., and Sarah Catherine Duffy, Esq., Ahlgren Law Office, counsel for MNR, LLC, and Olivia Farms, LLC.[1]

___

# INTRODUCTION

This matter is before the Court on Defendant BRR Properties, LLC's ("BRR") motion to dismiss. (Doc. No. 29.) Plaintiff Producers Livestock Credit Corporation

___

[1] There is currently no attorney on record for Revier Brand Group, LLC.

("PLCC") opposes the motion. (Doc. No. 35.) For the reasons set forth below, the Court denies the motion.

## BACKGROUND

### I. PLCC's Loan

In 2020, PLCC provided multiple loans to Revier Cattle Company ("RCC") so that RCC could purchase cattle. (Doc. No. 23 ("Am. Compl.") ¶ 8.) The loans were secured by the following: livestock, "all feed inventory for the cattle feeding operation, cattle feeding supplies," and proceeds of the same. (*Id.* ¶ 12.) Thomas Revier, who owns RCC, signed a guaranty, along with Libby Revier and Revier Farms Partnership ("RFP"), also owned by Thomas Revier. (*Id.* ¶ 13.) RCC then purchased cattle for use on its farm. (*Id.* ¶ 14.) RCC defaulted on the loans, and PLCC obtained a monetary judgment against RCC, Thomas Revier, and Libby Revier for $2,592,881.95. (*Id.* ¶ 21.)

### II. Prior Loans

Separately, RCC entered into a series of loans with Great Western Bank ("Original Loans") in 2010 and 2011. (*Id.* ¶ 23.) The Original Loans were secured by RCC's feedlot property and personal property, including feedlot equipment. (*Id.* ¶ 24.) The loans were later sold to Sandton Credit Solutions Master Fund IV, LP ("Sandton"). (*Id.* ¶ 23.)

### III. Alleged Fraudulent Scheme

In December 2021, BRR purchased the Original Loans from Sandton. (*Id.* ¶ 25.) The total purchase price was $8,740,000. (*Id.* ¶ 26.) PLCC alleges that RFP, RCC, and Thomas and Libby Revier sold certain unencumbered real property and remitted the

funds and certain mortgages to BRR for BRR to use towards the purchase of the Original Loans. (*Id.* ¶¶ 29-31, 68-85.) The unencumbered property included a $300,000 mortgage, a $750,000 mortgage, a $100,000 mortgage, and proceeds from the sale of land entitled C4D. (*Id.*) In total, PLCC alleges that the mortgages and sales exceeded $4,000,000. (*Id.* ¶ 85.) PLCC further alleges that RFP, RCC, and Thomas and Libby Revier did not receive any consideration or value for these mortgages or sales. (*Id.* ¶¶ 72, 76, 80, 84.) "The practical effect of this was that . . . RCC, and guarantor, RFP, funded nearly half of the total amount allegedly paid by BRR to purchase the Original Loans from Sandton." (*Id.* ¶ 32.)

In the meantime, PLCC alleges that Thomas Revier, BRR, RCC, and RFP "set in motion a plan to create two new entities to operate the cattle feedlot and related farm, stripped of the financial burdens created by RCC and RFP." (*Id.* ¶ 34.) The two new entities are MNR, LLC, and Olivia Farms, LLC. (*Id.* ¶ 38.) Thomas Revier acted on behalf of both MNR and Olivia Farms while his daughter, Moira Revier (who was in college at the time), served as the figurehead of both entities. (*Id.* ¶¶ 42, 44, 47, 49.) RCC then transferred the Feedlot Property to BRR via a Deed in Lieu of Foreclosure. (*Id.* ¶ 60.) BRR paid RCC less than $3,000 for the purchase. (*Id.* ¶ 61.) And MNR leased the Feedlot Property from BRR for a term of five years, with a monthly rent of $64,666.67. (*Id.* ¶ 62.) BRR then foreclosed on the Feedlot Property pursuant to the Original Loans and purchased the Feedlot Property at a sheriff's sale on October 6, 2022. (*Id.* ¶ 64.) PLCC asserts that BRR collected rent from the Feedlot Property for seventeen months prior to the foreclosure redemption period without applying the rent to the

3

Sandton debt. (*Id.* ¶¶ 65-67.) PLCC alleges that the "sole purpose of the Deed in Lieu was to allow MNR to start operating the Feedlot and pay rent to BRR," which allowed BRR to receive the rent proceeds without applying it to the Sandton debt. (*Id.* ¶ 66.)

MNR also entered into an equipment lease with RCC to use feedlot equipment ("Feedlot Equipment"), but MNR never paid RCC any of the rent. (*Id.* ¶¶ 90, 91.) RCC transferred its right to rents under the lease with MNR to BRR for no consideration. (*Id.* ¶ 92.) BRR then foreclosed on the Feedlot Equipment but pocketed the rent from March 2022 to October 2022 without applying the rent to the Sandton debt. (*Id.* ¶¶ 93-95.)

Similarly, Olivia Farms entered into a lease with RFP to use equipment for farming operations ("Farm Equipment"), but Olivia Farms never paid RFP any rent. (*Id.* ¶¶ 96-97.) RFP then transferred the right to receive rent under the lease to BRR for no consideration. (*Id.* ¶ 98.) BRR then foreclosed on the Farm Equipment but pocketed the rent without applying it to the Sandton debt. (*Id.* ¶¶ 99-101.)

In addition, MNR began operating the feedlot with $1,325,266.57 of cattle feed ("Feed") owned by RCC. (*Id.* ¶ 87.) PLCC alleges that the Feed was never subject to foreclosure proceedings and MNR did not provide any value to RCC in exchange for the Feed. (*Id.* ¶¶ 88-89.)

PLCC brings claims against BRR for fraudulent transfers under Minn. Stat. § 513.44(a)(1), (a)(2) and § 513.45 and for civil conspiracy. PLCC amended its complaint and now BRR moves to dismiss all claims against it.

4

## DISCUSSION

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

### I. Fraudulent Transfers

PLCC brings three claims against BRR for fraudulent transfers under Minn. Stat. § 513.44(a)(1), (a)(2), and § 513.45 of the Minnesota Uniform Voidable Transactions Act ("MUVTA"). BRR asserts that each claim should be dismissed for failure to state a claim.

#### A. Count 1

Count 1 involves fraudulent transfers under § 513.44(a)(1). Section 513.44(a)(1) makes voidable a transfer made by a debtor if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." PLCC alleges that "RCC and RFP transferred approximately $4,000,000.00 of real property or proceeds from the

5

sale of real property to or for the benefit of BRR's acquisition of the Original Loans from Sandton." (Am. Compl. ¶ 112.) PLCC further alleges that BRR "received additional real estate through the Deed in Lieu for little to no value, thereby allowing BRR to collect rents from the property that should have otherwise been paid to RCC." (*Id.* ¶ 113.) PLCC alleges that "[t]his scheme was orchestrated with the intent to hinder, delay, or defraud RCC and RFP's creditors, namely PLCC." (*Id.* ¶ 111.)

BRR makes a number of arguments in support of its motion to dismiss this count. First, BRR argues that PLCC has not pled the property involved in the $4,000,000 transfer with particularity, as required under Rule 9(b) of the Federal Rules of Civil Procedure. Specifically, BRR argues that "mortgages from Thomas and Libby Revier are irrelevant as to Count 1 because Count 1 does not allege Thomas and Libby Revier made voidable transfers." (Doc. No. 40 at 4.) In addition, BRR asserts that "Count 1 does not allege BRR received voidable mortgages"; it only refers to "real property or proceeds." (*Id.*)

The Court rejects BRR's hyper-technical reading of the Amended Complaint. The Amended Complaint clearly describes the transfers included in the $4,000,000 and incorporated these allegations into Count 1. (Am. Compl. ¶¶ 68-86, 107.) The transfers were made by RFP, Thomas and Libby Revier, and RCC. (*Id.*) PLCC alleges that Thomas and Libby Revier granted a mortgage to BRR that was not subject to the Sandton mortgage and in which they "did not receive any value" from BRR. (*Id.* ¶¶ 75-76.) In addition, PLCC alleges that the $4,000,000 included "mortgages and sales." (*Id.* ¶ 85.) The Court concludes that PLCC has pled each of these transfers in Count 1 with

6

particularity. Even if the Court had agreed with BRR, the Court would have allowed PLCC to further amend its complaint, which would have resulted in the same outcome.

BRR next argues that PLCC's assertion that RCC, RFP, and Thomas and Libby Revier received no value for the $4,000,000 is conclusory. BRR contends that PLCC was required to specifically allege that the remittance of the $4,000,000 to BRR did not reduce the Sandton debt. Again, the Court disagrees with this hyper-technical argument. PLCC alleges that RCC, RFP, and Thomas and Libby Revier did not receive any value in exchange for the mortgages and proceeds. (Am. Compl. ¶¶ 72-84.) On a motion to dismiss, the Court is to give PLCC "the benefit of every reasonable inference drawn from the well-pleaded facts." *Ossman v. Diana Corp.*, 825 F. Supp. 870, 880 (D. Minn. 1993) (internal quotations and citation omitted). Here, the Court can infer that if BRR did not provide value for the $4,000,000, then that means it did not apply the $4,000,000 to the Sandton debt. And again, even if the Court had agreed with BRR, the Court would have allowed PLCC to further amend its complaint, which would have resulted in the same outcome.

And lastly, BRR argues that because the Feedlot Property was fully encumbered, the Deed in Lieu did not involve a transfer of an asset and thus § 513.44(a)(1) does not apply. Section 513.44(a)(1) applies to "transfers." A "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset . . . ." § 513.41(16). "Asset" does not include "property to the extent it is encumbered by a valid lien." § 513.41(2)(i). BRR argues that because the Feedlot Property, along with its rents, was secured through the

7

Original Loans, it was not an asset under § 513.44(a)(1). BRR further asserts that any proceeds from the sale of unencumbered land, like C4D, would have also been secured through the Original Loans and thus would not qualify as an asset.

BRR's argument is premature. The Court cannot determine at this stage whether there was equity in the Feedlot Property, rents, or other proceeds. The Amended Complaint plausibly alleges that BRR pocketed assets—specifically, the rent from the Feedlot Property, Farm Equipment, and Feedlot Equipment, and mortgages and real property proceeds from unencumbered property—that was not applied to the Sandton debt. In other words, PLCC plausibly alleges that there was equity in the assets securing the Original Loans. Discovery and further fact-finding are required before the Court can conclusively determine whether these assets were fully encumbered. The Court therefore denies BRR's motion to dismiss Count 1.

### B. Count 6

Count 6 involves fraudulent transfers under § 513.44(a)(2), which makes voidable as to a creditor a transfer made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation." PLCC's allegations related to Count 6 are similar to Count 1. PLCC alleges that RCC transferred the Feedlot Property to BRR for less than $3,000 and that RCC, RFP, and Thomas and Libby Revier transferred mortgages and real property proceeds to BRR without consideration. (Am. Compl. ¶¶ 155-57, 167.) PLCC further alleges that RFP and RCC transferred their rights to rents from Farm Equipment and Feedlot Equipment to BRR for no consideration. (*Id.* ¶¶ 159-61, 172-74.)

BRR again argues that the Feedlot Property is not an asset because it was fully encumbered. As noted above, the Court cannot make that determination at this time without more information regarding the total value of the secured assets, what assets were used to satisfy the Sandton debt, and whether BRR acquired assets that were not used to satisfy the Sandton debt, without providing reasonable value.

Additionally, BRR argues that the RCC, RFP, and Thomas and Libby Revier received reasonable value for the unencumbered property because BRR provided a promise of forbearance in exchange for the additional collateral. BRR cites to an email attached to the Amended Complaint that references an agreement for BRR to forebear "[a]ll actions to liquidate the personal property collateral" in exchange for various "mortgages on certain real estate . . . not pledged to Sandton." (Am. Compl., Ex. C.) In response, PLCC contends that any argument related to the alleged forbearance is premature because there is a fact dispute regarding whether the forbearance was instead a front for the fraudulent scheme. As evidence, PLCC notes that BRR did not actually forbear, as BRR "immediately took title to the Feedlot Property . . . and thereafter proceed to foreclose on the Feedlot Property." (Doc. No. 37 at 22.) Nor did BRR forbear from enforcing its security interest in the Feedlot or Farm Equipment, as BRR "collected rental payments related to the equipment and foreclosed on this equipment within one year of acquiring the Sandton debt." (*Id.* at 22-23.) And interestingly, any argument that the forbearance applied to the Feedlot and Farm Equipment directly contradicts BRR's assertion that RCC and RFP had no right to the equipment following a prior state court order. The Court agrees with PLCC that there is clearly a factual dispute surrounding the

9

forbearance that the Court is unable to resolve at the motion to dismiss stage. PLCC has sufficiently alleged that RCC, RFP, and Thomas and Libby Revier transferred mortgages and sales proceeds from the unencumbered property without receiving reasonably equivalent value.

BRR also argues that Count 6 should be dismissed related to the Farm and Feedlot Equipment because the equipment is not an asset. As noted above, the Court declines to make a determination on this issue at this stage of the proceedings. In addition, BRR argues that a state court order gave Sandton, and later BRR, the right to repossess the Feedlot and Farm Equipment and therefore "RCC and RFP lacked the legal right to possess—let alone derive rents therefrom." (Doc. No. 31 at 13.) As noted above, the email referencing forbearance appears to contradict this argument. The email stated that "[a]ll actions to liquidate the personal property collateral will be immediately suspended." (Am. Compl., Ex. C.) Thus, the email seems to acknowledge that RCC and RFP continued to possess the equipment and notes an alleged agreement to forbear from enforcing BRR's security interest in the Feedlot or Farm Equipment. Moreover, PLCC argues that the state court order did not transfer title of the equipment and instead merely gave Sandton the right to repossess the equipment. At a minimum, these arguments underscore a factual dispute that the Court cannot resolve on a motion to dismiss.

Based on the above, the Court denies BRR's motion to dismiss Count 6.

C. **Count 7**

Count 7 involves fraudulent transfers under § 513.45, which makes a transfer voidable as to a creditor when the transfer was made "without receiving a reasonably

10

equivalent value in exchange for the transfer" and "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  PLCC specifically alleges that RCC, RFP, and Thomas and Libby Revier were insolvent and granted BRR proceeds from the sale of land and mortgages in real property for no consideration.  (Am. Compl. ¶¶ 182-85, 190.)  In addition, PLCC alleges that RCC transferred the Feedlot Property to BRR without receiving equivalent value, and BRR collected rents for the Farm and Feedlot Equipment for no consideration.  (*Id.* ¶¶ 186-89.)

BRR makes the same arguments regarding the unencumbered property, rights to rents, and receipt of the Deed in Lieu as it made for Counts 1 and 6, which the Court rejects for the reasons outlined above.  In addition, BRR argues that, related to the right to rents, BRR was not a subsequent transferee under MUVTA, because "PLCC only alleges that MNR and Olivia Farms transferred economic benefits, not the property itself, to BRR." (Doc. No. 31 at 17.)  But PLCC alleges that BRR received more than mere economic benefits from a debtor's property.  PLCC alleges that "RCC transferred the right to rents under the Feedlot Equipment Lease to BRR" and that "RFP transferred the right to receive rents under the Farm Equipment Lease to BRR."  (Am. Compl. ¶¶ 92, 98.)  Thus, PLCC asserts that BRR was a direct transferee.  The Court therefore denies BRR's motion to dismiss Count 7.

II.   **Civil Conspiracy**

Lastly, PLCC brings a civil conspiracy claim against BRR.  PLCC alleges that BRR, Olivia Farms, MNR, RCC, RFP, and Thomas Revier "conspired to establish MNR and Olivia Farms as fraudulent successors in interest to RCC and RFP" in order to

11

"transfer RCC's and RFP's assets away from creditors for the benefit of MNR, Olivia Farms, and BRR." (Am. Compl. ¶¶ 208-09.) PLCC alleges that the transfers were made to BRR, Olivia Farms, and MNR without providing reasonably equivalent value. (*Id.* ¶ 212.)

To plead a civil conspiracy claim, PLCC must establish "that two or more people worked together to accomplish (1) an unlawful purpose or (2) a lawful act by unlawful means." *Fredin v. Middlecamp*, 500 F. Supp. 3d 752, 798 (D. Minn. 2020) (internal quotations and citation omitted). "Under Minnesota law, a conspiracy is not an independent cause of action." *Clarinda Color, LLC v. Nelson*, No. 04-cv-4917, 2005 WL 8162956, at *3 (D. Minn. Nov. 23, 2005). Instead, a conspiracy claim must be "supported by an underlying tort." *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997). A civil conspiracy claim does not "change the nature of the cause of action" but instead "increases the number of persons potentially liable." *Clarinda Color*, 2005 WL 8162956, at *3. In other words, "a civil conspiracy claim . . . is merely a means for asserting vicarious or joint and several liability." *Am. Comput. Tr. Leasing v. Jack Farrell Implement Co.*, 763 F. Supp. 1473, 1489 (D. Minn. 1991).

BRR argues that this claim should be dismissed because PLCC fails to plead an underlying tort. PLCC alleges several violations of MUVTA by MNR, Olivia Farms, and BRR, including fraudulent transfer based on actual fraud, which can serve as the predicate tort for civil conspiracy.[2] *See Cedar Rapids Lodge & Suites, LLC v. Seibert*,

---

[2] The Court need not address the full scope of PLCC's civil conspiracy claim at this time.

No. 14-cv-4839, 2018 WL 747408, at *18 (D. Minn. Feb. 7, 2018) (concluding that the "actual-fraud form of fraudulent transfer" under Minn. Stat. § 513.44(a)(1) can serve as a "predicate tort" for civil conspiracy).  The Court therefore denies BRR's motion to dismiss Count 9.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that BRR's motion to dismiss is (Doc. No. [29]) is **DENIED.**

Dated:  June 12, 2024           s/Donovan W. Frank
                                DONOVAN W. FRANK
                                United States District Judge

13